J-S11032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| ANTHONY CORBIN, | : | |
| | : | |
| Appellant | : | No. 537 EDA 2015 |

Appeal from the PCRA Order February 24, 2015
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0012372-2007

BEFORE: FORD ELLIOTT, P.J.E., OTT and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED APRIL 19, 2016**

Anthony Corbin ("Corbin") appeals from the Order dismissing his first

Petition filed pursuant to the Post Conviction Relief Act ("PCRA"). **See** 42

Pa.C.S.A. §§ 9541-9546. We affirm.

The PCRA court set forth the relevant underlying factual and

procedural history, which we adopt for the purpose of this appeal. **See**

PCRA Court Opinion, 7/10/15, at 1-3.

On appeal, Corbin raises the following questions for our review:

1. Was trial counsel ineffective for failing to request an instruction under **Commonwealth v. Kloiber**[, 106 A.2d 820 (Pa. 1954),] where, of the two eyewitnesses who testified, both said that they were "not sure" of their identifications and one previously identified someone other than [Corbin]?

2. Was trial counsel ineffective for failing to impeach (a) the jailhouse informant with substantial evidence of his bias and severe mental health problems[,] and (b) one identification witness with her many pending criminal cases?

3. Was trial counsel ineffective for failing to object to the trial court's instructions that required substantial doubt for acquittal; relieved the Commonwealth of its burden to prove all elements of consciousness of guilt[,] and then allowed the jury to convict solely on such evidence; invaded the jury's province on the ultimate issue in the case; omitted any reference to the all-important lapse in time between the crime and the witnesses' identifications; and improperly pressured the jury to reach unanimity?

4. Was trial counsel ineffective for failing to object to the trial court's improper bolstering of the credibility of a central Commonwealth witness?

5. Was trial counsel ineffective for failing to request a cautionary instruction on evidence implicating [Corbin] in uncharged bad acts and crimes?

6. Was direct [appeal] counsel ineffective for failing to raise the claim that the trial court erred in prohibiting impeachment of the central witness with evidence that he had committed several armed robberies?

7. Is [Corbin] entitled to relief as a result of the cumulative impact of all of these errors?

Brief for Appellant at 3-4.

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error.

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

As each of Corbin's claims involve the ineffective assistance of counsel, to succeed on such a claim, he must demonstrate by the preponderance of the evidence that

- 2 -

(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). Counsel is presumed to be effective, and the burden is on the appellant to prove otherwise. *Commonwealth v. Hanible*, 30 A.3d 426, 439 (Pa. 2011).

In his first claim, Corbin contends that his trial counsel was ineffective for failing to request, or object to the trial court's failure to give a *Kloiber* instruction. Brief for Appellant at 10. Corbin argues that the Commonwealth presented the testimony of two eyewitnesses, Odessey Spearman ("Spearman") and John Gallagher ("Gallagher"), neither of whom were positive in identifying Corbin as the perpetrator. *Id*. at 10-13. Corbin asserts that the PCRA court properly found that counsel did not have a reasonable basis for failing to seek a *Kloiber* instruction, but challenges its finding that Corbin suffered no prejudice based upon his admissions to three biased witnesses. *Id*. at 13-15; *see also id*. at 16 (arguing that the jury assessed the credibility of the three witnesses under the erroneous impression that there were no problems with the identification testimony of Spearman and Gallagher); 18 (asserting that without credible identification evidence, the jury would have been left with only the three witnesses who

had heard Corbin's admission). Corbin claims that there was no physical evidence linking him to the crime, and that the identifications by Spearman and Gallagher were central to the jury's deliberations. *Id*. at 14. Corbin also argues that counsel failed to impeach one of the witnesses, Burnie Tindale ("Tindale"), to whom Corbin admitted his involvement in the crimes. *Id*. at 17-18. Corbin maintains that the jury's long deliberation evidenced a lack of overwhelming evidence, and demonstrated that the lack of a *Kloiber* instruction prejudiced him. *Id*. at 18-20.

"A *Kloiber* instruction informs the jury that an eyewitness identification should be viewed with caution when either the witness did not have an opportunity to view the defendant clearly, equivocated on the identification of the defendant, or has had difficulties identifying the defendant on prior occasions." *Commonwealth v. Sanders*, 42 A.3d 325, 332 (Pa. Super. 2012). "Where an eyewitness has had protracted and unobstructed views of the defendant and consistently identified the defendant throughout the investigation and at trial, there is no need for a *Kloiber* instruction." *Ali*, 10 A.3d at 303 (citation and quotation marks omitted). "When the witness already knows the defendant, this prior familiarity creates an independent basis for the witness's in-court identification of the defendant[,] and weakens ineffectiveness claims based on counsel['s] failure to seek a *Kloiber* instruction." *Id*. A *Kloiber* charge, however, is "distinct from the credibility determination a fact-finder must

make." ***Commonwealth v. Collins***, 70 A.3d 1245, 1255 (Pa. Super. 2013). "We evaluate whether a ***Kloiber*** instruction is necessary under an abuse of discretion standard." ***Sanders***, 42 A.3d at 332-33.

With regard to Spearman, she testified that on November 3, 2003, at lunchtime, she observed two men rob and shoot the victim. N.T., 1/15/09, at 142-55, 166. A few hours after the robbery, Spearman told investigating detectives that she had previously seen one of the perpetrators in the neighborhood. ***See id***. at 155-56, 166-67; ***see also id***. at 159 (wherein Spearman stated that Corbin "looked familiar."). As part of her identification, Spearman stated that the shooter was about 5-foot-4 to 5-foot-5 inches tall, but that she was not good with estimating heights. ***Id***. at 165-66. On March 17, 2007, Spearman selected a picture of Corbin from a photo array, and identified him as the shooter. ***See id***. at 168 (wherein Spearman stated that "I picked it out because it was the guy that shot the white guy."); ***see also*** N.T., 1/20/09, at 43-44 (wherein Detective Charles Boyle ("Detective Boyle") corroborated Spearman's testimony that she picked Corbin out of a photo array without hesitation).[1] At trial, Spearman identified Corbin as the assailant, despite the fact that unlike the day of the shooting, Corbin did not have a beard, was not wearing a "hoodie," and weighed less. ***Id***. at 157; ***see also id***. (wherein Spearman, in identifying

---

[1] Spearman also identified Rasheed Jenkins ("Jenkins"), Corbin's co-conspirator, from a photo array. N.T., 1/15/09, at 157-61.

Corbin at trial, stated that Corbin looked like the assailant, "just smaller," and that Corbin was "bigger" on the day of the shooting).

Here, the PCRA court concluded that a **Kloiber** instruction was required as to Spearman because her identification "was weakened by [the] qualification (he 'looked like,' 'looked familiar,' he was 'bigger') and by the obstruction of the hoodie that was up." PCRA Court Opinion, 7/10/15, at 7; **see also id**. at 6 (noting that while Spearman stated Corbin was 5-foot-4 to 5-foot-5 inches tall, he was, in fact, 5-foot-11 inches tall).[2] We disagree.

Our review discloses that Spearman merely testified that Corbin was wearing a "hoodie," or a hooded sweatshirt, on the day of the shooting, not that that hood was actually up when she observed him. **See, e.g.,** N.T., 1/15/09, at 157, 164-65. Our review of the record further reflects that Spearman had ample opportunity to clearly observe Corbin; she was never equivocal about her identification; and she did not misidentify Corbin in the past. **See Ali**, 10 A.3d at 303. Spearman's statement that Corbin looked different over five years after the shooting does not demonstrate equivocation of her identification. Further, while it is evident from Spearman's testimony that her representation of Corbin's height was incorrect, this, in itself, does not require a **Kloiber** instruction, but goes to

---

[2] The PCRA court focused upon Spearman's testimony that she "wasn't really paying attention," and "just noticed" the co-conspirators standing on the street prior to the shooting. PCRA Court Opinion, 7/10/15, at 6. However, Spearman clearly stated that she observed the co-conspirators when they were robbing and shooting the victim. N.T., 1/15/09, at 163-64.

her credibility. Indeed, with regard to **Kloiber** and eyewitness identification, there is a difference between the witness's *opportunity* to observe and the *quality* of the witness's observation. **See Commonwealth v. Cleveland**, 703 A.2d 1046, 1049 (Pa. Super. 1997) (stating that "once the opportunity to observe is established[,] it becomes defense counsel's cross-examination, not the court's **Kloiber** charge, which must highlight any problems with the quality of a witness's observation."). Any perceived problem with the quality of Spearman's observations were matters of credibility for the jury; the height issue did not undermine her ability to identify Corbin. Based upon the foregoing, a **Kloiber** instruction was not required as to Spearman.

With regard to Gallagher, he testified that he was working on a construction site on November 3, 2003, when he heard a commotion and saw two men, one of whom was holding a gun, run and jump into a car and drive away. N.T., 1/15/09, at 114-22. Gallagher described the male holding the gun as an African-American, "husky," and with a beard and mustache. *Id*. at 124-25. On December 13, 2006, Gallagher picked two photos out of an array in attempting to identify the person holding the gun. *Id*. at 127-29; **see also id**. at 132 (wherein Gallagher stated that he thought the picture that did not portray Corbin was more likely the man with the gun). At trial, Gallagher testified that he could no longer identify the person with the gun. *Id*. at 130.

Detective Boyle testified that on December 13, 2006, Gallagher immediately picked Corbin's photo from the photo array. N.T., 1/20/09, at 37, 55, 56. Detective Boyle stated that Gallagher picked another photo after inquiring whether he would have to go to court to testify. *Id*. at 38, 55, 56. Detective Boyle testified that in Gallagher's written statement, Gallagher selected two photos in attempting to identify the shooter. *Id*. at 38-39.

Our review discloses that the trial court instructed the jury regarding how to evaluate testimony of the witnesses who had identified Corbin as the perpetrator. *See* N.T., 1/22/09, at 112-13 (instructing the jury to consider, *inter alia*, whether the witness had a good opportunity to observe the perpetrator, whether the witness had made a prior identification of Corbin as the perpetrator, whether the witness's identification was positive, or qualified by hedging or inconsistencies, and whether the witness identified anyone else as the perpetrator).

Here, Gallagher picked out two photos from the array in 2006, and never identified Corbin at trial. Based upon the fact that Gallagher did not explicitly identify Corbin as the perpetrator, we conclude that no *Kloiber* instruction was required. *See Commonwealth v. Sanders*, 42 A.3d 325, 335 (Pa. Super. 2012) (holding that the trial court did not err in declining to provide a *Kloiber* instruction, where the witness did not identify the defendant at trial, and the trial court instructed the jury to consider whether the identification was qualified by hedging, and all of the circumstances

surrounding the identification); *see also id*. (stating that "[u]nlike the typical *Kloiber* situation, where there is a damaging in-court identification of the accused, the same type of concerns are not present where a witness declines to identify the defendant in court.").[3]

Moreover, even if *Kloiber* instructions should have been given to the jury, Corbin cannot demonstrate that he was prejudiced by this failure. Indeed, the PCRA court noted that Corbin admitted to the robbery and murder to various witnesses.[4] *See* PCRA Court Opinion, 7/10/15, at 8-11. We agree and adopt the sound reasoning of the PCRA court, as to the prejudice prong of the ineffectiveness test concerning this claim. *See id*. Thus, Corbin's first claim is without merit.

In his second claim, Corbin contends that trial counsel was ineffective for failing to impeach the testimony of Tindale, who testified that Corbin admitted to the crimes while they were incarcerated together in federal prison. Brief for Appellant at 20, 24. Corbin argues that there was substantial evidence of Tindale's bias in favor of the Commonwealth because

---

[3] Even if we consider Detective Boyle's testimony that Gallagher had initially picked a photo of Corbin, but hedged on his identification due to concerns about his and his family's safety, as identification testimony, a *Kloiber* instruction was not necessary. *See Commonwealth v. Lee*, 585 A.2d 1084, 1087 (Pa. Super. 1991) (concluding that a *Kloiber* instruction was unnecessary where the witness's fear of identifying the defendant could not be equated to a witness's failure to make an identification).

[4] With regard to Corbin's claim pertaining to impeaching Tindale's testimony, we note that Corbin has raised a separate claim to this effect and we will address the claim below.

he was seeking a lighter sentence for his crimes. *Id*. at 20-24; *see also* Reply Brief for Appellant at 9-16 (asserting that counsel was ineffective for failing to impeach Tindale with "other crimes" evidence, despite impeaching Tindale in other ways). Corbin further argues counsel failed to impeach Tindale based on his mental health issues, including hallucinatory psychosis. Brief for Appellant at 25-26.[5]

With regard to Tindale's alleged mental health issues, the PCRA court addressed Corbin's claim and determined that it is without merit. *See* PCRA Court Opinion, 7/10/15, at 11-12; *see also Commonwealth v. Hutchinson*, 556 A.2d 370, 372 (Pa. 1989) (stating that the petitioner has the burden to prove his ineffectiveness allegations by submission of relevant evidence in support of the claim). We adopt the sound reasoning the PCRA court for the purpose of this appeal. *See* PCRA Court Opinion, 7/10/15, at 11-12.

With regard to Tindale's bias toward the Commonwealth, we note that "[c]ross-examination may be employed to test a witness'[s] story, to impeach credibility, and to establish the witness'[s] motive for testifying.

---

[5] Corbin also asserts counsel should have impeached Tindale on his testimony that Corbin had shown the discovery in the case to Tindale when confessing, despite the fact that Corbin had not been charged with the crimes. Brief for Appellant at 25. However, Corbin did not raise this claim in his court-ordered Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement. Thus, it is waived on appeal. *See Commonwealth v. Lane*, 81 A.3d 974, 979 (Pa. Super. 2013) (noting that any issues not raised in a Rule 1925(b) concise statement are waived on appeal); *see also* Pa.R.A.P. 1925(b)(3)(iv).

Further, a witness may be cross-examined as to any matter tending to show the interest or bias of that witness." ***Commonwealth v. Hyland***, 875 A.2d 1175, 1186 (Pa. Super. 2005) (citations omitted). "Whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury." ***Id***. (citation omitted). Further, defense counsel must be permitted to cross-examine a Commonwealth witness on possible favorable treatment, in exchange for testimony for the Commonwealth, so that the jury may consider the witness's possible ulterior motives, to accurately to assess credibility. ***Id***. "The scope of cross-examination is a matter within the discretion of the trial court and will not be reversed absent an abuse of that discretion." ***Commonwealth v. Ballard***, 80 A.3d 380, 394 (Pa. 2013).

Here, the PCRA court addressed Corbin's claim and determined that it

is without merit. **See** PCRA Court Opinion, 7/10/15, at 27-28.[6] Moreover, in addition to testimony elicited at trial, Corbin's counsel argued to the jury that Tindale had a motive to lie because he was seeking a break on his own sentence. **See** N.T., 1/22/09, at 40-44; N.T., 1/15/09, at 36, 39-43. Thus, the PCRA court properly rejected Corbin's claim, and we adopt its sound reasoning for the purpose of this appeal. **See** PCRA Court Opinion, 7/10/15, at 27-28.[7]

Corbin also contends that trial counsel was ineffective for failing to impeach Spearman's testimony, based upon the fact that she had criminal cases pending against her when she made statements to the police. Brief for Appellant at 26-28; **see also id**. at 26-27 (noting that, *inter alia*,

---

[6] We note that Corbin cites to various crimes Tindale allegedly committed that counsel should have used to impeach Tindale. Brief for Appellant at 22-23. However, Tindale was not charged or convicted with crimes in these instances. **See, e.g., Commonwealth v. Patterson**, 91 A.3d 55, 68-69 (Pa. 2014) (noting that a witness's veracity "may not be impeached by prior arrests which have not lead to convictions. Pa.R.E. 608(b) precludes the admission of specific instances of misconduct to attack a witness'[s] character for truthfulness while Pa.R.E. 609(a) requires an actual conviction of a crime involving dishonesty or false statement in order for a witness's credibility to be attacked with evidence of the crime."). Thus, trial counsel was not ineffective for failing to impeach Tindale with inadmissible evidence. **See Commonwealth v. Harris**, 703 A.2d 441, 450 (Pa. 1997) (stating that where "evidence was either irrelevant or inadmissible, counsel cannot be deemed ineffective for failing to present it.").

[7] Additionally, we note that Corbin has not demonstrated that he was prejudiced by counsel's actions where he admitted his involvement in the robbery and murder to two other people. **See** PCRA Court Opinion, 7/10/15, at 8-10; **see also Commonwealth v. Rainey**, 928 A.2d 215, 233 (Pa. 2007) (stating that "[i]f it is clear that [a]ppellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone[.]").

Spearman had a prostitution case pending when she gave her first statement to the police in 2003; she was on probation in a prostitution case and a drug case when she gave a statement in 2007; and she had other drug arrests in 2006 and 2007). Corbin asserts that Spearman was attempting to curry favor with the Commonwealth in providing statements to the police. *Id*. at 26, 28.

Here, the PCRA court addressed Corbin's claims and determined that they are without merit. *See* PCRA Court Opinion, 7/10/15, at 28. We adopt the sound reasoning of the PCRA court for the purpose of this appeal. *See id*.[8]

In his third claim, Corbin contends that his trial counsel was ineffective for failing to object to the trial court's various jury instructions. *See* Brief for Appellant at 28-50. First, Corbin argues that the trial court's instruction on reasonable doubt improperly added a requirement that the jury must find a substantial doubt to acquit Corbin. *Id*. at 29, 31-32, 34. Corbin asserts that the instruction relieved the Commonwealth of its burden of proof. *Id*. at 30, 31; *see also id*. (wherein Corbin points to the part of the instruction

---

[8] Even if counsel had improperly failed to examine Spearman on her prior criminal history, Corbin has not demonstrated that the outcome of the proceedings would have been different, in light of his admission to the crime. *See Commonwealth v. Cox*, 728 A.2d 923, 933 (Pa. 1999) (noting that "trial counsel's failure to cross-examine these witnesses concerning bias stemming from an outstanding warrant, criminal charges, probations, or paroles, this would not so prejudice the [a]ppellant that the result of this trial would have been different if counsel had pursued this line of questioning.").

regarding a scenario about a loved one in need of surgery as relieving the Commonwealth of its burden). Corbin claims that the instruction was so egregious that harmless error could not be found. *Id*. at 32; *see also id*. at 32-33 (noting that the instruction did not include language requiring a vote for acquittal if a juror "pauses" or "hesitates").

Here, the PCRA court set forth the relevant standard of review with regard to jury instructions, addressed Corbin's claim concerning the reasonable doubt instruction, and concluded that it is without merit. *See* PCRA Court Opinion, 7/10/15, at 12-15. We agree and adopt the PCRA court's reasoning for the purpose of this appeal. *See id*.

Corbin next contends that counsel was ineffective for failing to object to the incomplete jury instruction on consciousness of guilt. Brief for Appellant at 34. Corbin argues that the Commonwealth sought the instruction based on the change in his appearance in order to conceal himself, but that the court failed to instruct the jury that it could find a consciousness of guilt if it found that he had intentionally changed his appearance to avoid detection. *Id*. at 35, 38. Corbin asserts that the trial court deviated from the standard jury instruction, and never instructed the jury that it was not permitted to base its decision solely on evidence of concealment. *Id*. at 36-37, 38-39.

The PCRA court addressed Corbin's claim and concluded that it is without merit. **See** PCRA Court Opinion, 7/10/15, at 15-16. We adopt the sound reasoning of the PCRA court for the purpose of this appeal. **See id**.

Corbin also argues that his trial counsel was ineffective for failing to object to the jury instruction regarding identification testimony. Brief for Appellant at 39-40. Corbin asserts that the trial court's instruction that several people identified him as the perpetrator is belied by the record. **Id**. at 39-41, 42; **see also id**. at 40 (wherein Corbin argues that Spearman and Gallagher did not present clear identification testimony). Corbin claims that the trial court improperly instructed the jury to focus on specific evidence to convict him. **Id**. at 42-43. Corbin additionally contends that counsel should have raised a claim regarding the trial court's failure to instruct the jury about the length of time between the crime and identifications. **Id**. at 43-46.

The PCRA court addressed this claim and determined that it is without merit. **See** PCRA Court Opinion, 7/10/15, at 20-21.[9] We adopt the sound reasoning of the PCRA court for the purpose of this appeal. **See id**.

Corbin next claims that the trial court improperly pressured the jury to reach unanimity when issuing a verdict. Brief for Appellant at 46-47, 48-49. Corbin contends that a juror hearing the instruction would feel obligated to agree with the majority in rendering a verdict. **Id**. at 47-48.

---

[9] As noted above, a **Kloiber** instruction was not required with regard to the testimony of Spearman and Gallagher.

The PCRA court addressed this claim and determined that it is without merit. **See** PCRA Court Opinion, 7/10/15, at 24-25. We adopt the sound reasoning of the PCRA court for the purpose of this appeal. **See id**.

Corbin finally argues that the cumulative errors with regard to the jury instructions deprived him of due process. Brief for Appellant at 49-50. As we have concluded that the ineffectiveness claims are without merit, Corbin's argument fails. **See Commonwealth v. Reid**, 99 A.3d 470, 520 (Pa. 2014) (stating that "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually.").

In his fourth claim, Corbin contends that trial counsel was ineffective for failing to object to the trial judge's prejudicial comments regarding Detective Boyle. Brief for Appellant at 50-54. Corbin directs our attention to the trial court's statement that Detective Boyle was an old friend with whom she had previously worked. **Id**. at 50, 51. Corbin asserts that these comments bolstered Detective Boyle's testimony regarding the identification testimony by Spearman and Gallagher. **Id**. at 51-52. Corbin claims that the judge's statements denied him a fair trial, and counsel had no strategic basis for failing to object to the statements. **Id**. at 53-54.

The PCRA court addressed Corbin's claim and determined that it is without merit. **See** PCRA Court Opinion, 7/10/15, at 26-27; **see also** N.T., 1/22/09, at 105 (wherein the trial court instructed the jury that a determination on the credibility of a witness is within the sole province of the

jury); ***Commonwealth v. Tedford***, 960 A.3d 1, 37 (Pa. 2008) (stating that a jury is presumed to follow a trial court's instructions). We adopt the PCRA court's reasoning for the purpose of this appeal. ***See*** PCRA Court Opinion, 7/10/15, at 26-27.[10]

In his fifth claim, Corbin contends that trial counsel was ineffective for failing to request an instruction on "other crimes" evidence. Brief for Appellant at 54. Corbin argues that an instruction was necessary for (1) the testimony of Jaunita Topping that she saw Corbin and Jenkins pass guns back and forth; (2) the testimony of Heather DiTaranto that she saw Corbin with guns and that Corbin had threatened to kill her family and made other violent threats against her; and (3) the testimony of Detective Boyle regarding Gallagher's reluctance to testify based on fear of retaliation. ***Id***. at 54-56. Corbin relies upon ***Commonwealth v. Billa***, 555 A.2d 835 (Pa. 1989), to support his contention. Brief for Appellant at 57.

The PCRA court addressed Corbin's claims and determined that they are without merit. ***See*** PCRA Court Opinion, 7/10/15, at 31-35; ***see also Commonwealth v. Blystone***, 725 A.2d 1197, 1204-05 (Pa. 1999) (stating that counsel was not ineffective for failing to seek corrective measures in response to a witness's references to appellant's prior criminal activity where there was overwhelming evidence of guilt). We adopt the sound reasoning

---

[10] Even if counsel improperly failed to object to the judge's comments, Corbin has not demonstrated that the outcome of the proceedings would have been different, in light of his admission to the crimes.

of the PCRA court for the purpose of this appeal. **See** PCRA Court Opinion, 7/10/15, at 31-35.

In his sixth claim, Corbin contends that direct appeal counsel was ineffective for failing to raise a claim that the trial court erred in prohibiting the introduction of evidence that Tindale had committed armed robberies, for which he had not been charged. Brief for Appellant at 58. Corbin argues that this evidence would have demonstrated that Tindale's testimony was a result of Tindale receiving favorable treatment from the Commonwealth. **Id**. at 58-59. Corbin asserts that this claim had a greater chance to succeed than the "utterly silly claims" direct appeal counsel raised. **Id**. at 59-60.

The PCRA court addressed Corbin's claim and determined that it is without merit. **See** PCRA Court Opinion, 7/10/15, at 35; **see also id**. at 27-28. We adopt the sound reasoning of the PCRA court for the purpose of this appeal. **See id**.

In his final claim, Corbin contends that the cumulative impact of the errors deprived him of a fair trial. **See** Brief for Appellant at 60-61. As noted above, "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." **Reid**, 99 A.3d at 520; **see also** PCRA Court Opinion, 7/10/15, at 36. Thus, Corbin is not entitled to relief on his final claim.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/19/2016</u>

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
## CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH** | CP-51-CR-0012372-2007 Comm. v. Corbin, Anthony<br>Opinion | **CP-51-CR-0012372-2007** |
| **VS.** | | |
| **ANTHONY CORBIN** | <br>7317837481 | **SUPERIOR COURT**<br>**NO. 537 EDA 2015** |

<u>OPINION</u>

**FILED**

By: The Honorable Benjamin Lerner, S.J.

JUL 1 0 2015

Criminal Appeals Unit
First Judicial District of PA

## PROCEDURAL HISTORY

On January 26, 2009, following a capital jury trial before the Honorable Renee Cardwell Hughes, petitioner was convicted of first degree murder, criminal conspiracy, robbery and possessing an instrument of crime (PIC). Petitioner's penalty phase hearing commenced the following day. The jury returned a verdict of life imprisonment without parole.

On January 28, 2009, Judge Hughes sentenced petitioner to life imprisonment on the murder bill and to consecutive prison terms of seven (7) to fourteen (14) years on both the robbery and conspiracy bills and one (1) to two (2) years PIC bill.

Petitioner thereafter filed post-trial motions, which the trial court denied on March 6, 2009. Petitioner appealed. On July 13, 2010, the Superior Court affirmed petitioner's judgment of sentence. <u>Commonwealth v. Corbin</u>, No 926 EDA 2009. The Pennsylvania Supreme Court denied his Petition for Allowance of Appeal on March 30, 2011. <u>Commonwealth v. Corbin</u>, No 416 EAL 2010.

On June 22, 2011, petitioner filed the instant PCRA petition. Daniel Silverman, Esq. was subsequently appointed to represent petitioner. Mr. Silverman filed an amended petition on petitioner's behalf. In response, the Commonwealth filed a Motion to Dismiss. This court

1

heard oral argument on November 10, 2014 and held the matter under advisement.

On February 24, 2015, after reviewing the trial record, pleadings and arguments of counsel, this court dismissed the petition without holding an evidentiary hearing[1] after finding that that the petition had no merit[2]. Petitioner filed an appeal the same day.

Petitioner thereafter filed a *pro se* 1925(b) statement with this court raising 34 claims, the majority of which were not advanced by PCRA counsel during the underlying proceedings. On March 9, 2015, PCRA counsel filed a 1925(b) Statement on behalf of his client. Counsel's 1925(b) statement raised 13 claims.

## FACTS

The trial court aptly stated the relevant facts are as follows:

> On November 4, 2003 at approximately 9:00am, Angela White-Bing ("Bing") was the manager of the Ace Check Cashing ("Ace") store located at 873 Belmont Avenue near Lancaster and Ogden avenues in the City and County of Philadelphia. (N.T. 01/15/09, pgs. 98; 12). Bing prepared a deposit to be picked up by a plainclothes courier. (N.T. 01/15/09, pgs. 101-102, 174). The deposit consisted of $6,000.00 in $20.00 bills; $6,000.00 in large bills and another $15,000.00 in checks. *Id.* Sometime before noon, Anthony Corbin ("Appellant") and his accomplice Rasheed Jenkins ("Jenkins") were seen loitering under a billboard affixed to the side of a home located on Lancaster Avenue near Belmont Avenue. (N.T. 01/15/09, pgs. 143-146). At approximately noon, Thomas Nolle, Jr., ("Nolle/decedent") an Ace courier, arrived to pick up the deposit. (N.T. 01/15/09, pg. 102). Nolle arrived in a blue utility van that is shared by all couriers. (N.T. 01/15/09, pg. 174). The van's only identification was the label "Certified Personal Trainers" on the backdoor. *Id.* Nolle entered the store, took the deposit and placed it in a black and white duffle bag labeled "Gold's Gym". (N.T. 01/15/09, pg. 102; 21). As he exited the store onto Belmont Avenue, Nolle was ambushed by the appellant and his

---

[1] Unfortunately, both of petitioner's trial attorneys died before his PCRA case came before this court, rendering an evidentiary hearing pointless.

[2] This court sent a twenty (20) day Notice of Intent to Dismiss pursuant to Pa.R.Crim.P. 907 prior to dismissing the PCRA petition.

accomplice. (N.T. 01/15/09, pgs. 149-151). The appellant held Nolle at gunpoint, while Jenkins snatched the duffle bag and ran off down the street. (N.T. 01/15/09, pg. 151; 5-15). Appellant turned to run away and took approximately five or six steps, but he stopped, turned back to Nolle and fired once into his chest. (N.T. 01/15/09, pg. 152). As the decedent fell to the ground, the appellant and Jenkins ran east on Ogden Street and then south on 43rd street into a vacant trash strewn lot at 835 N. 43rd street. (N.T. 01/15/09, pgs. 117-122; 01/16/09, pgs. 41-42). The appellant and Jenkins spent only a few seconds emptying the cash receipts from the Gold's Gym bag carried by the decedent. (N.T. 01/15/09, pgs. 121-122). They quickly emerged from the lot crossing 43rd street to escape in a white car driven by Endrece Gaithers ("Gaithers"). *Id.*

Shortly thereafter, appellant received a call from Heather DiTaranto ("DiTaranto"), his son's mother, who called to alert him that she was running late to meet him at his grandmother's house because of police detours in the immediate area of Ace Check Cashing. (N.T. 01/16/09, pg. 70). After arriving at appellant's grandmother's house at 615 North Creighton Street, DiTaranto parked outside the home and waited approximately 15-20 minutes for appellant to arrive on foot, (N.T. 01/16/09, pg. 70; 13-25). Appellant got into the car and told DiTaranto that he was the reason for the police detours on Belmont Avenue. (*N.T.* 01/16/09, pg. 71). Appellant confessed that he and Jenkins robbed a courier and that he shot the courier. *Id* Appellant also confessed to his live-in girlfriend, Juantia Topping ("Topping"), that he and Jenkins robbed the check cashing place delivery guy. (N.T. 01/16/09, pg. 25). Neither of these women came forward to the police to make a statement until DiTaranto contacted the Federal Bureau of Investigation ("FBI") in November of 2006 about an unrelated matter involving the appellant. (N.T. 01/16/09, pg. 75). The FBI forwarded this information to the Philadelphia Police. On July 25, 2007, the appellant was arrested by the Philadelphia Police. (N.T. 01/05/09, pg. 12).

(See Judge Hughes' Opinion, filed 8/9/2009, pp. 1-3).

## ISSUE(S)

Petitioner raises the following claims:

I-VII. Trial counsel rendered ineffective assistance by:

1. Failing to request or object to the trial court's refusal to give an instruction regarding eyewitness identification pursuant to Commonwealth v. Kloiber, 378 Pa. 412, 106

3

A.2d 820 (1954).

2. Failing to impeach Commonwealth witness Burnie Tindale with his alleged mental health issues;

3. Failing to object to numerous alleged defective jury instructions given by the trial court (reasonable doubt, consciousness of guilty; witness identification; burden of proof; closing argument; time lapse; murder; requirement of unanimity);

4. Failing to object to improper remarks/comments the trial court made to Detective Boyle when he took the stand;

5. Failing to impeach Commonwealth witnesses Odessey Spearman and Burnie Tindale regarding their criminal records;

6. Failing to request an instruction regarding Spearman and Tindale's potential bias in favor of the Commonwealth as a result of their records;

7. Failing to request a jury instruction regarding "other crimes" evidence;

VIII. Direct appeal counsel was ineffective for failing to raise the claim that trial court erred in prohibiting the defense from establishing that Burnie Tindale committed other crimes;

IX. Petitioner claims that the cumulative effect of these alleged errors deprived his of a fair trial;

X. The PCRA court erred in not granting petitioner's discovery motion; and

XI. Finally, petitioner claims that the PCRA court erred in not considering the issues he raised in his *pro se* PCRA petition.

See petitioner's Statement of Matters Complained of on Appeal.

4

## DISCUSSION

The law in Pennsylvania presumes that counsel was effective. Commonwealth v. Cross, 535 Pa. 38, 634 A.2d 173 (1993). When evaluating claims of ineffective assistance of counsel, the first issue to be determined is whether the issue underlying the claim has arguable merit. Commonwealth v. Johnson, 527 Pa. 118, 122, 588 A .2d 1303, 1305 (1991). If the claim has merit, it must be determined whether counsel's course of action or inaction had a reasonable basis to further the defendant's interests. Commonwealth v. Copenhefer, 526 Pa. 555, 587 A.2d 1353 (1991). If no reasonable basis for counsel's course of action exists, appellant will be granted relief only if he or she demonstrates that counsel's improper course of conduct prejudiced him or her. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984); Commonwealth v. Pierce, 515 Pa. 153, 159, 527 A.2d 973, 975 (1987). Prejudice in this context has been defined to mean that an appellant must establish that, but for the arguably ineffective act or omission of counsel, there is a reasonable probability that the outcome of the proceeding would have been different. Commonwealth v. Jones, 546 Pa. 161, 683 A.2d 1181 (1996); Commonwealth v. Douglas, 537 Pa. 588, 645 A.2d 226 (1994). Appellant bears the burden of proving all three prongs of this standard. Commonwealth v. Baker, 531 Pa. 541, 614 A.2d 663 (1992).

### I. Identification Instructions

Petitioner claims that trial counsel was ineffective for neither requesting nor objecting to the trial court's refusal to give an instruction regarding eyewitness identification pursuant to Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820 (1954).

The primary defense theory of the case was misidentification. The Commonwealth

5

presented two identification witnesses - Odessey Spearman and John Gallagher. Spearman testified that she observed two men loitering under a billboard affixed to the side of a home near the check cashing agency shortly before noon. At around noon, the men robbed the regular courier, who had just left the check cashing agency with a duffle bag full of cash. After snatching the bag from the courier's hand, one of the men took a few steps away and then turned around and shot the courier in the chest. Spearman witnessed the entire incident.

In March of 2007, several years after the incident, Spearman was shown a photo array. She picked petitioner's photo saying "he look like the guy that was wearing a gray hoodie that shot the white guy". (Id., pp. 158-159). She also said that petitioner looked familiar and that she might have seen him before in the area. When asked by the prosecutor at trial whether she saw anyone in the courtroom that she saw on the day of the incident, Spearman had trouble making a positive identification. Spearman stated that she was sure of her photo ID in 2007, but was not so sure of her ID at trial in 2009. (Id., p. 159). She testified in regard to petitioner that "it look like him only smaller." She explained that the male she saw on the day of the shooting "had a hoodie on and he was kind of bigger." (N.T. 1-15-09, p. 157). In her description to police on the day of the incident, she estimated petitioner's height as 5'4" to 5'5". Petitioner is 5'11. Spearman then testified that she "wasn't really paying attention" to what was happening and "just noticed them". (Id., p. 163).

The other ID witness, John Gallagher, was working at a nearby construction site when he heard the commotion. Shortly thereafter he saw two Black males running up Ogden Street from Lancaster Avenue. One was holding a gun and the other a duffle bag. He described the male with the gun to police as husky with a beard and mustache and the other male as skinnier. Several years later, on December 13, 2006, police showed Gallagher a photo array in which

6

petitioner's photo was in position #1. When asked if he could ID anyone, Gallagher said: "It's either number one or number three. It would be the huskier male, the one with the gun. I can't be sure, but if I saw him in person, I might be able to say which one. But it's definitely the huskier one." (Id, p. 129). He then circled both #1 and #3 photos "because the two looked like the guy but I was not sure." (Id., p. 130). Gallagher then told police "I wish I could be more sure." At trial Gallagher stated that, with the passage of time, he could no longer ID the person. (Id). During cross-examination, Gallagher testified that he immediately chose #3 photo (not petitioner) because #3 was the stronger ID.

At the pre-charge conference, Judge Hughes stated that she would not instruct the jury to consider Spearman and Gallagher's identification testimony with caution. Despite the obvious problems with the identification witnesses' testimony, trial counsel neither requested nor objected to the absence of a Kloiber charge. Kloiber requires that where "the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by the failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the court should warn the jury that the testimony as to identity must be received with caution". Id at 424, 106 A.2d at 826-827 (1954). Here, Spearman's identification testimony was weakened by qualification (he "looked like," "looked familiar," he was "bigger") and by the obstruction of the hoodie that was up. Gallagher's identification was more qualified and tentative than Spearman's. He identified someone else as the shooter in a photo array and said he was "not sure" about his identification of petitioner's photo.

This court did not have the benefit of conducting an evidentiary hearing on this issue because petitioner's trial counsel was deceased. However, in light of Spearman and Gallagher's

7

somewhat uncertain and qualified identification testimony, it is difficult to imagine any reasonable basis for trial counsel's decision to not request a <u>Kloiber</u> charge. Likewise, there was no reasonable basis to for trial counsel's failure to object to the court's inexplicable failure to give the <u>Kloiber</u> instruction. Thus, if the Commonwealth's case against petitioner depended exclusively, or even primarily, on the identification evidence, a new trial might well be required.

That being said, when the evidence presented at trial is considered in full petitioner cannot that show a different verdict was likely had counsel and the trial court handled this issue correctly. In addition to Spearman and Gallagher's testimony, the Commonwealth presented compelling testimony from several other witnesses that linked petitioner to the crime and established his identity as the assailant. Petitioner made unsolicited admissions to these witnesses regarding his involvement in the robbery and murder.

Heather DiTaranto's 2006 statement to police appears to have been the driving force in solving this case. After DiTaranto gave her statement, police met with Juanita Topping. Then, in 2007, the FBI obtained information from Burnie Tindale, one of petitioner's fellow inmates.

At trial, DiTaranto testified about her relationship with petitioner and her conversations with him about the shooting. DiTaranto testified that she had a son with petitioner. On the day of incident, she was taking her son to visit petitioner at his mother's home. DiTaranto got stuck in traffic due to crime scene. Petitioner called her and told her he was running late. When she arrived, petitioner walked up and got in her car. According to DiTaranto, petitioner was visibly upset. He told her that he was the reason the roads were blocked. Petitioner confided that he had just robbed somebody and thought he had killed him. He also told DiTaranto that he and Rasheed had robbed a money courier and, when the courier pulled his gun, he (petitioner) did what he had to do. (N.T., 1/16/09, pp. 60-71).

8

A few days after the incident, DiTaranto learned that the victim had children. She asked petitioner how he felt about it. Petitioner reiterated that he did what he had to do. Despite these revelations, DiTaranto did not report petitioner to authorities. She stated that she didn't know if the police would believe her, and she feared that he would harm her or her child if she went to the police. (N.T. 1/16/09, pp. 70-71, 75).

Eventually, DiTaranto came forward. On November 16, 2006, she gave a statement to Homicide Detectives. The statement was precipitated by petitioner threatening DiTaranto and her family because she no longer brought his son to visit him in Philadelphia. DiTaranto reported the threats to a family member, who was a police officer in NJ. The FBI investigated and subsequently recorded conversations between petitioner and DiTaranto. These tapes were referred to briefly but not introduced at trial.[3] (N.T., 1/16/09, pp. 74-77).

DiTaranto also testified that she had seen petitioner with handguns and a sawed-off shotgun in the past, and that petitioner was a friend of accomplices Eldrice Gaithers and Rasheed Jenkins. (Id.)

On cross-examination, defense counsel pressed DiTaranto on why she waited three years before contacting authorities. He delved into issues regarding other women, child custody, threats, etc. to establish she was biased and had a motive to lie. (N.T., 1/16/09, pp. 77-109).

Juanita Topping also testified for the Commonwealth. She was petitioner's live-in girlfriend at the time of the shooting. Topping testified that petitioner's sister worked at an Ace check cashing store. According to Topping, petitioner knew Eldrice Gaither, who was dating Topping's sister and was the alleged get-away driver in a white car owned by Rasheed Jenkins. Like DiTaranto, Topping gave a statement to Homicide Detectives. At trial, Topping had

---

[3] Petitioner was convicted in Federal Court in New Jersey for those threats.

9

difficulty remembering the details of her statement and, at times, was evasive when questioned about the contents of her statement. However, she testified that what she had told police was the truth. (N.T. 1/16/09, pp. 10-38).

In her statement, Topping told the police that petitioner, Gaither and Jennings were friends. She overheard a conversation in 2003 (shortly after the shooting) between petitioner and DiTaranto regarding money. Petitioner told DiTaranto that he would give $ 1,000 to her parents. Topping confronted petitioner because she needed money to pay rent. When she asked petitioner where he got the money, he told her that he and Rasheed had robbed a check casing place and the delivery man. . (N.T. 1/16/09, pp. 24-27; N.T. 1/20/09, pp. 29-32). Petitioner said that he did it to get money so DiTaranto's parents could pay their mortgage. When Topping pushed for more details, petitioner stated that he did what he had to do and left. (Cite to N.T and Commonwealth Exhibit C-49).

During cross-examination, defense counsel challenged Topping's veracity and bias against petitioner. Specifically, counsel questioned Topping about her relationship with petitioner and the fact that he had been unfaithful and did not provide her with monetary support. (N.T. 1/16/09, pp. 31-36).

Bernie Tindale was one of petitioner's cellmates in a federal prison. On Aril 25, 2007, Tindale, petitioner and a third inmate were discussing their respective cases. At this point, petitioner had already been arrested and charged in the instant case and was awaiting trial. Petitioner told Tindale that had committed the robbery and murder. He didn't know that Tindale was an informant. Tindale then relayed petitioner's confession to the police. (N.T., 1/20/09, pp. 4-38).

10

Thus, despite the uncertainty of the identification witnesses' testimony, there was ample evidence to establish beyond a reasonable doubt that petitioner was, in fact, the shooter. See Commonwealth v. S. Jones, 954 A.2d 1194, 1197 (Pa.Super.2008), *appeal denied,* 599 Pa. 708, 962 A.2d 1196 (2008) (Evidence of identification need not be positive and certain to sustain a conviction.). Petitioner was not prejudiced by trial counsels' ineffectiveness with regard to the court's charge on the identification issues

## II.  Counsel's alleged failure to impeach Burnie Tindale with regard to his mental health issues

Next, petitioner claims that trial counsel was ineffective for failing to impeach Burnie Tindale with his alleged mental health issues. This claim has no merit.

In his Amended Petition, petitioner argues that Tindale may have "imagined" his 2007 confession while they were cellmates. In support of this contention, petitioner points to a forensic evaluation from 2005 that was conducted in connection with petitioner's federal case. This evaluation, which took place two years before petitioner made his admission to Tindale and four years before he testified at petitioner's trial, concluded that Tindale was competent to stand trial for his crimes.

The Pennsylvania Rules of Evidence provide that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Pa.R.E. 401.

11

Other than referring to Tindale's 2005 mental health evaluation, petitioner presented no evidence that Tindale was suffering from any sort of mental defect that would tend to establish he imagined or hallucinated petitioner's confession. Thus, petitioner has not shown that Tindale's mental health status in 2005 was either relevant or admissible, and that trial counsel was ineffective for failing to impeach Tindale with this information. See Commonwealth v. Harris, 703 A.2d 441 (holding that trial counsel not deemed ineffective for failing to argue or present irrelevant or inadmissible evidence).

III. **Trial counsel's failure to object to alleged defective jury instructions on reasonable doubt, consciousness of guilt, burden of proof, closing argument, identification instruction/time lapse, murder and the requirement of a unanimous verdict**

Petitioner's claims that trial counsel was ineffective for failing to object to the trial court's jury instructions on reasonable doubt, consciousness of guilt, burden of proof, closing argument, murder and the requirement of unanimity. These claims have no merit.

It is well settled that a trial court is free to choose its own form of expression when instructing the jury. Commonwealth v. McComb, 462 Pa. 504, 341 A.2d 496 (1975); Commonwealth v. Alvin 357 Pa.Super. 509, 516 A.2d 376 (1986), *alloc. denied,* 515 Pa. 603, 529 A.2d 1078 (1987). A defendant has no right to specify the exact language the trial court must employ. Commonwealth v. La, 433 Pa.Super. 432, 640 A.2d 1336 (Pa.Super. 1994). Where the basic charge properly covers a requested point, it is not error for the trial judge to refuse to give additional instructions. Commonwealth v. Newsome, 462 Pa. 106, 337 A.2d 904 (1975), *and* Commonwealth v. Gardner, 246 Pa.Super. 582, 589-590, 371 A.2d 986 (Pa. Super. Ct., 1977). "When evaluating jury instructions, the charge must be read as a whole to determine

12

whether it was fair or prejudicial." Commonwealth v. Prosdocimo, 525 Pa. 147, 150, 578 A.2d 1273, 1274 (1990). So long as the trial court's jury charge fully and adequately explains the relevant legal principles which to apply to the evidence presented at trial, the charge is correct and will be upheld on appeal. Commonwealth v. Kyle, 367 Pa.Super. 484, 533 A.2d 120 (1987), *appeal denied,* 518 Pa. 617, 541 A.2d 744 (1988). The refusal to give a proper instruction requested by a defendant is ground for a new trial only if the substance thereof has not otherwise been covered by the trial court's general charge. Commonwealth v. Shoup, 423 Pa.Super. 12, 620 A.2d 15, 20 (1993).

Although Judge Hughes' charges in these areas were personalized, trial judges are granted a certain degree of latitude in their jury instructions. Judge Hughes stayed within those boundaries.

## A.    **Reasonable Doubt Instruction**

Judge Hughes gave the following instruction regarding reasonable doubt and burden of proof:

> ...It is the Commonwealth's burden to prove each and every one of the crimes charged beyond a reasonable doubt. That's the standard, proof beyond a reasonable doubt, the absolute highest standard in the law. The Commonwealth bears this burden, but ladies and gentlemen, the Commonwealth's burden is not proof beyond all doubt. The Commonwealth is not required to meet some mathematical certainty. The Commonwealth is not to demonstrate the complete impossibility of innocence. The Commonwealth must reach a reasonable doubt.
>
> A reasonable doubt is a doubt that would cause a reasonably careful or sensible person to pause or to hesitate or to refrain from acting upon a matter of the highest importance in their own affairs or their own interest. A reasonable doubt must fairly arise from the evidence that was presented or out of the lack of evidence presented with respect to some element of each of the crimes charged.

Now, I'm literally going to define each of the crimes that have been charged for you. The Commonwealth's burden is to prove those elements beyond a reasonable doubt.

Ladies and gentlemen, I find it helpful to think about reasonable doubt in this fashion. Each one of you has someone in your life who is absolutely precious, a spouse, a significant other, a child, a grandchild, someone who is just precious in your life. What if you were told that your precious one had a life-threatening condition and that the best and only protocol was surgery? Now very likely you're going to ask for a second opinion, maybe a third opinion. You're probably going to call everybody you know in medicine and say, What do you know about this condition? What do you know about this protocol? What do you know about this doctor? Tell me how the surgery works. Who has done it, who hasn't done it, which hospital, all the research you can do, everything.

But at one point, some moment in time, the question will be, do you allow your loved one to go forward with the surgery? If you go forward, it's not because you moved beyond all doubt. There are no guarantees. If you go forward, it's because you moved beyond all reasonable doubt.

Ladies and gentlemen, a reasonable doubt must be a real doubt. It may not be a doubt that is imagined or manufacture to avoid carrying out an unpleasant responsibility. You may not find Anthony Corbin guilty based upon a mere suspicion of guilt. The Commonwealth's burden is proving that Anthony Corbin is guilty beyond a reasonable doubt. If the Commonwealth has met that burden, then Anthony Corbin is no longer presumed to be innocent and you should find him guilty. On the other hand, if the Commonwealth has not met it's burden, then you must find him not guilty.

(N.T. 1/22/09, 103-04).

The court's tailored jury instruction was substantially similar to Pennsylvania Criminal Suggested Standard Jury Instruction 7.01, titled "Presumption of Innocence: Burden of Proof; Reasonable Doubt." Viewing this lengthy instruction as a whole, it aptly covered the relevant law regarding reasonable doubt and burden of proof. Thus, trial counsel was not ineffective for failing to object to this charge. See Commonwealth v. Fisher, 572 Pa. 105, 813 A.2d 761 (2004) (trial counsel cannot be deemed ineffective for failing to object to a proper jury charge). Moreover, with regard to the trial court's illustration of a medical procedure to describe the

14

importance of a reasonable doubt, there is no evidence suggesting it caused the jury to, as petitioner states in his Response to Commonwealth's Motion to Dismiss, "up the ante to require a grave or serious doubt." This is pure speculation and conjecture. The court's instruction clearly and definitively conveyed the definition of a reasonable doubt to the jury. This claim has no merit.

## B.   Consciousness of Guilt

The Commonwealth asked for and received an instruction for consciousness of guilty because there was testimony that petitioner had changed his appearance between the time of the shooting and his trial. (N.T., 1/21/09, pp. 28-29). The court instructed the jury as follows:

> Now, ladies and gentlemen, there was evidence in this proceeding which tended to show that Anthony Corbin changed his appearance after the date of the matters that are before you. If you believe this evidence, you may consider it as tending to prove Anthony Corbin's consciousness of guilt. You're not required to do so. You should consider and weigh this evidence along with all the other evidence in the proceeding as you reach your decision.

(N.T., 1/22/09, p. 110).

Petitioner argues that this instruction was improper because it allowed the jury to infer guilt solely because petitioner's appearance had changed and did not ask the jury to consider whether he had changed his appearance intentionally. This claim has no merit.

The trial court instructed the jury that it could consider and weigh the evidence regarding petitioner's change of appearance along with all the other evidence in the proceeding. This charge was nearly identical to Pennsylvania Criminal Suggested Standard Jury Instruction 3.15. In no way did it suggest that the jury could find petitioner guilty solely because he had allegedly changed his appearance following the crime. See Commonwealth v. Holland, 480 Pa. 202, 217-

15

18, 389 A.2d 1026, 1033 (1978) (trial court properly instructed jury that, where the prosecution established, by direct or circumstantial evidence, that the defendant altered his appearance to avoid apprehension, an inference of consciousness of guilt may arise, which, in connection with other proof, may form the basis upon which guilty may be inferred); *Cf.* Commonwealth v. Howard, 511 Pa. 398, 315 A.2d 514 (1986) (consciousness of guilty instruction which enabled jury to infer guilty solely based on the defendant's change of appearance was held erroneous).

Petitioner also claims the court should have given Suggested Standard Criminal Jury Instruction 3.14, which addresses consciousness of guilt as it pertains to flight and/or concealment. Since there was no evidence that the defendant fled or attempted to conceal his whereabouts, there was no need for such an instruction.

The trial court's instruction on the issue of consciousness of guilt was proper, and trial counsel was not ineffective for failing to object to it.

## C.    **Burden of Proof**

At the close of evidence and before the next day's closing arguments and instructions were made, the trial court stated:

> Ladies and gentlemen, we have now heard all of the evidence that is to be presented in this proceeding. What remains are two things. I will give the lawyers a final opportunity to address you, then I will charge you on the law.
>
> Now, in all candor, although we haven't been with you, we have been working all afternoon. Closing statements are not evidence. They are never to be treated as evidence. Closing statements are a useful tool. And because they can be a useful tool, I actually give my lawyers an opportunity to prepare.
>
> *The purpose of the closing statement is to allow the lawyer to walk you through the record and say this is what they claim they were going to prove, they did prove it, they didn't prove.* It lets them give you their

16

perspective on how these witnesses should be viewed, how this evidence should be treated.

Now, lawyers are advocates. They're going to present their closing statements in the light most beneficial to their client, but that's their job. That's their oath…

…Once they close, Mr. Siegel will close first. Mr. Cameron will close last. Mr. Cameron closes last because it's his burden of proof that these charges have or have not been made out. That's his burden…

(N.T., 1/21/09, pp. 39-41).

Petitioner argues that the portion of Judge Hughes' statement, which is highlighted above, somehow shifted the burden of proof to the defense, and, thus, should have been objected to by defense counsel. This assertion is ridiculous. It completely ignores the context and content of Judge Hughes' entire statement. The court clearly stated that the Commonwealth bears the burden of proof. It also ignores the repeated and consistent instructions the court gave throughout the proceedings with regard to burden of proof.

In her opening charge, Judge Hughes stated:

Ladies and gentlemen…the citizen who is accused of a crime is not required to do anything literally. Not to open, not to cross-examine witnesses, not to present evidence. A citizen who is accused of a crime does not have to do a single thing. The burden is solely the Commonwealth's to prove that a crime was committed by this citizen…

(N.T., 1/15/09 p.6).

During the closing charges, the trial court instructed the jury as follows:

A citizen is presumed to remain innocent throughout the trial unless and until you conclude based upon a careful and impartial examination of the evidence that the Commonwealth has proven him guilty beyond a reasonable doubt of the charges that have been brought against him.

Ladies and gentlemen, it is not the defendant's burden to prove that he is not guilty. It is the Commonwealth that always bears the burden of proving each and every element of the crimes charges and that the

17

defendant is guilty of those crimes beyond a reasonable doubt

(N.T., 1/22/09, pp. 99-100).

> Now ladies and gentlemen, I talk about the Commonwealth's burden. It is the Commonwealth's burden to prove each and every one of the crimes charged beyond a reasonable doubt. That's the standard, proof beyond reasonable doubt, the absolute highest standard in the law.
>
> Now, I'm literally going to define each of the crimes that have been charged for you. The Commonwealth's burden is to prove those elements beyond a reasonable doubt.

(N.T., 1/22/09, pp. 102-103).

Each and every one of these instructions reinforced the fact that the Commonwealth alone bears the burden of proof and that the defendant is innocent unless and until the Commonwealth proves beyond a reasonable doubt every element of the charged offenses. Petitioner's claim has no merit, and trial counsel was not ineffective for failing to object to the statement in question.

### D.    Closing Arguments

Petitioner next claims that trial counsel was ineffective for failing to object to the trial court's instructions regarding closing arguments. He argues that the court's instructions essentially caused the jurors to disregard counsel's commentary altogether. This claim has no merit.

At the close of evidence, Judge Hughes instructed the jury as follows:

> The purpose of the closing statement is to allow the lawyer to walk you through the record and say this is what they claim they were going to prove, they did prove it, they didn't prove. It lets them give you're their perspective on how these witnesses should be viewed, how this evidence should be treated.
>
> Now, lawyers are advocates. They're going to present their closing

18

statements I the light most beneficial to their client, but that's their job. That's their oath…

…Once they close, Mr. Siegel will close first. Mr. Cameron will close last. Mr. Cameron closes last because it's his burden of proof that these charges have or have not been made out. That's his burden…

(N.T., 1/21/09, pp. 39-41).

Then, immediately before defense counsel began his closing argument, Judge Hughes again instructed the jury regarding closing arguments. The court stated:

Closing arguments are not evidence and *cannot be the basis for a decision.* They are a tool. They can be a useful tool. The purpose of closing arguments is to allow each attorney the opportunity to walk through the evidence…

Now, you must apply the only the law as I give it to you, that's why I actually charge you last. The lawyers will very likely discuss the law. I ask them not to, but they can't help it. It's just the nature of being a lawyer. They can't help it. So they will very likely talk about the law, but you must follow the law only as I instruct you…

(N.T., 1/22/09, pp. 12-14).

Petitioner takes one phrase – "cannot be the basis for a decision" - out of context to support his claim that the court's instructions resulted in the jury completely disregarding the arguments of counsel. This contention is disingenuous and completely ignores the court's instructions as a whole and the context in which those instructions were given. The trial court's closing charges accurately instructed the jury how to consider the arguments of counsel. The court stated that closing arguments are <u>not</u> evidence and that they are a useful tool to review the evidence presented at trial and the weight to be afforded it. This instruction, although tailored, conveyed the same principles as Suggested Standard Jury Instruction (Crim) 7.03. The court's instruction was proper, and counsel was not ineffective for failing to object to it.

19

E.  **Identification Instruction & Time Lapse**

Petitioner next claims that trial counsel failed to object when the trial court failed to specifically instruct the jury that it should consider the length of time between the crime and the IDs.

During a mid-trial conference, defense counsel requested a general precautionary instruction regarding identification. In response, Judge Hughes stated: "I'm not going to instruct them to accept identifications with caution. I'm going to tell them the factors they should focus on, lighting, whether it was an identification by a person that was known, things of that nature..." (N.T., 1/20/09, pp. 84-85).

The following day, after Judge Hughes colloquied petitioner regarding his decision to testify, he asked the court whether it would instruct the jury on the factors of the likelihood of misidentification. Petitioner cited the U.S. Supreme Court's decision in Neil v. Biggers, 409 U.S. 188 (1972) to argue that the length of time between the crime and the confrontation was a potential factor that could lead to misidentification. Both the court and trial counsel told petitioner that the standard charge, although not using the same language used in Biggers, sufficiently addressed misidentification factors. (N.T., 1/21/09, pp. 24-26).

Then, during the final charging conference, the court informed the parties that it would merge Pennsylvania Suggested Jury Instructions regarding "Identification Testimony – Accuracy in Doubt," with "Identification Testimony – Accuracy Not in Doubt." The court then instructed the jury as follows:

> Ladies and gentlemen, in your analysis of the witnesses, you will quickly come to the conclusion that several witnesses indentified Anthony Corbin as the person who committed the crimes.
>
> In evaluating the testimony of each of these witnesses, in addition to other instructions I have provided you for assessing the testimony of

20

witness, consider the following additional factors: Did the witness have a good opportunity to observe the perpetrator of the offense? In other words, what was the witness' position, where was the witness standing at the relevant time? Was there sufficient lighting for the witness to make the observation? Was the witness close enough to the individual to note facial hair or other physical characteristics, as well as clothing that was worn by the perpetrator? Has the witness made a prior identification of Anthony Corbin as the perpetrator of these crimes in any other proceeding? Was the witness' identification positive, or was it qualified by hedging or inconsistencies? During the course of this case, has the witness indentified anyone else as the perpetrator?

In considering whether or not to accept the testimony of the witness, consider all of the circumstances under which the identifications were made. You should consider all of the evidence relative to the question of who committed the crime, including the testimony of any witness from which identity or the lack of identity of the perpetrator may be inferred. You may not find Anthony Corbin guilty unless you are satisfied beyond a reasonable doubt by all of the evidence not only that a crime was committed, but that it was committed by Anthony Corbin.

The purpose of the closing statement is to allow the lawyer to walk you through the record and say this is what they claim they were going to prove, they did prove it, they didn't prove it.

(N.T., 1/22/09, pp. 112-113)

The trial court's identification charge covered all of the relevant factors required by Pennsylvania law. The fact that the court did not give a charge that was specifically tailored to the petitioner's personal preference is of no import. That charge was proper, and trial counsel was not ineffective for failing to object to it. See Commonwealth v. Kyle, 533 A.2d 120, 133 (Pa. Super 1987), appeal denied, 541 A.2d 744 (Pa. 1998) (a more specific Kloiber charge was not required where the trial court's alternative charge did not ignore identification factors).

21

## F.    Instruction on Murder

Petitioner contends that Judge Hughes' instructions on the charge of murder were erroneous and trial counsel was ineffective for failing to object to the erroneous instruction.    In support of this claim, petitioner cites a single paragraph from Judge Hughes' lengthy closing charge.  Judge Hughes' stated:

> Ladies and gentlemen, Anthony Corbin is charged with taking the life of Thomas Nolle by criminal homicide.  There are several possible verdicts you might reach in this case.  As I shared with you a moment ago, you can find Anthony Corbin not guilty of every degree of murder.  But if you determine that Thomas Nolle's death was a murder, you must tell me which degree.
>
> ***
>
> Ladies and gentlemen, this is actually really a very easy verdict sheet, but it's designed to drive home a point that is so very important.  A person can be not guilty of everything.  But if you determine the Thomas Nolle's death was homicide, if you determine that Thomas Nolle's death was, more specifically, a murder, you must tell me which degree.  I don't know.  I don't get to decide.

(N.T., 1/22/09, pp. 126, 142)

Petitioner argues that the court used language which did not instruct the jury that it had to find that petitioner was the perpetrator in order to find him guilty of the victim's murder - thereby relieving the Commonwealth if its burden to prove beyond a reasonable doubt that petitioner was the person who actually committed the murder.  This argument is completely disingenuous.  It has no merit and is belied by the record.

In making this claim, petitioner completely disregarded the remainder of the trial court's instructions of the varying degrees of murder.  Those instructions provided, in pertinent part, as follows:

> There are three choices relevant to this proceeding.  Murder in the first

22

degree, murder in the second degree, or murder in the third degree.

\*\*\*

Anthony Corbin is charged with first-degree murder. First-degree murder is murder in which the perpetrator has the specific intent to kill. To find Anthony Corbin guilty of first-degree murder, you much find the following three things: First, that Thomas Nolle is dead; second, **that Anthony Corbin killed him; and third, that Anthony Corbin did so with the specific intent to kill.**

\*\*\*

Anthony Corbin is charged with second-degree murder. With felony murder, the elements of felony murder which must be proven beyond a reasonable doubt--the standard never changes--is, **first, that Anthony Corbin killed Thomas Nolle; second, that Anthony Corbin did so while committing or attempting to commit or fleeing after the commission or attempt to commit a robbery; and, third, that Anthony Corbin was acting with malice.**

\*\*\*

Finally, ladies and gentlemen, third-degree murder is a killing with malice that is not first or second, in other words, first requires specific intent to kill; second requires a killing that occurs as a result of the commission of a felony; third means that there is malice but it doesn't have those other elements. So you would have to find beyond a reasonable doubt that Thomas Nolle was dead. **That, second, Anthony Corbin killed him. And third, that Anthony Corbin did so with malice**. Remember, for purposes of third-degree murder, malice exist if the perpetrator's actions show a wanton and willful disregard of an unjustified and extremely high risk that the perpetrator's conduct would result in death or serious bodily injury.

(N.T., 1/22/09, pp. 126-142)(emphasis added).

It is abundantly clear from the court's instructions on the varying degrees of murder that the jury could only convict petitioner if it found beyond a reasonable doubt that he was the person who killed the victim. The court's instructions on the charge of murder were proper. Thus, trial counsel was not ineffective for failing to object.

23

## G.    Jury Unanimity

Petitioner next claims that trial counsel failed to object to the court's erroneous instructions regarding jury unanimity. The court instructed the jury as on its deliberations and the issue of unanimity as follows:

> There are just a few final thing s I need to share with you; one is to talk with you about how you reach a verdict. A verdict is the unanimous decision of the first 12. It is not a majority vote. This is critical, ladies and gentlemen. Whatever decision you make must be the unanimous decision of the first 12.
>
> Ladies and gentlemen, fundamentally and ultimately, each one of you must decide this case for yourself, but I ask you not to reach that personal conclusion until you have taken the opportunity to dialogue with your fellow jurors.
>
> ***
>
> Ladies and gentlemen, in the course of your deliberations, you shouldn't hesitate to change your mind or to re-examine your views about any of the evidence if you are convinced by an honest and open dialogue that your recollection or your understanding is not accurate. But once you have reached a conclusion, you are not required to change your mind simply because your position is different from any other juror's and certainly not for the purpose of bringing me a verdict.
>
> Now, I mentioned to you earlier that the foreperson's job is to communicate with me. The foreperson can also be extremely helpful in guiding you through your deliberations, and I would encourage you as your first act to select a foreperson. The foreperson will communicate with me. The foreperson can guide you through your deliberations. And your foreperson will ultimately announce your verdict in open court. So it can be an extremely useful position. But a foreperson has one vote just as the other 11 have one vote. That title brings me no greater weight when you call the vote than anybody else's
>
> ***
>
> Ladies and gentlemen, you can't bring me a bad verdict. It's absolutely impossible. Think about this a moment. When you met each other a lifetime ago, you didn't know each other. But when I see you, 12 strangers will be in agreement. How powerful is that? If you think about how hard it is to get somebody who loves you to agree

24

with you, especially when they are a teenager, then you know how powerful it is when 12 strangers come together and agree. A long as your verdict is grounded on that which you deem to be truthful, accurate and reliable, your verdict is golden. And I am appreciative of that.

Now, before I let you go, I need to talk to my alternates, but I need to see if my lawyers want to talk to me before I speak to my alternates. Okay.

(N.T., 1/22/09, pp. 134-136).

The trial court's instructions generally mirror Pennsylvania Suggested Standard Criminal Jury Instructions 2.08, titled "Deliberations and Verdict," and 7.08, titled "Role of Jury – Deliberations; Verdict Must Be Unanimous." Neither of these suggested instructions included language requiring the trial court to discuss the possibility of a hung jury. Indeed, the Subcommittee Note to Instruction 7.08 provides that language regarding the consequences of a jury's failure to reach a unanimous verdict was purposely omitted because it could invite the possibility of a hung jury.

Appellate case law follows the same rationale. In Commonwealth v. Patrick, 416 Pa. 437, 206 A.2d 295 (1965), the defendant challenged the court's instruction on jury unanimity. The Supreme Court rejected Patrick's argument and held a trial Judge is under no duty to specifically charge that jurors may disagree. Id. at 446; See also: Commonwealth v. Ford, 193 Pa. Super. 588, 165 A.2d 113 (1960).

Judge Hughes' instructions regarding jury unanimity were proper, and trial counsel was not ineffective for failing to object to them.

25

## IV. Trial court's alleged improper comments regarding Detective Boyle

Petitioner claims that trial counsel was ineffective for failing to object to the trial court's comments regarding Detective Charles Boyle. Petitioner argues that the court's improper comments regarding Detective Boyle effectively bolstered the Detective's credibility in the eyes of the jury.

The Commonwealth called Detective Charles Boyle as one of its key witnesses. Detective Boyle had interviewed all of the witnesses in this case. He testified about his conversations and interactions with Spearman, Gallagher and Topping. He also read Topping's entire statement, which was entered into evidence after she recanted. During closing arguments, the prosecutor cited Detective Boyle's testimony to explain why Gallagher backtracked on his identification and to clear up Topping's alleged loss of memory at trial about having seen petitioner and Rasheed passing guns back and forth. His testimony was also used to bolster Spearman's identification. (N.T. 1/20/09, pp. 24-32, 37-38).

Prior to Detective Boyle taking the stand, the trial court gratuitously told the jury that she had worked with the detective on cases in the past, had not seen him since he retired, and that it was so good to see him. (N.T. 1/20/09, p. 22). While the court's remarks were certainly inappropriate and may have been legally improper and trial counsel did not object to the remarks, there is no evidence that petitioner was prejudiced by them. Immediately after greeting Detective Boyle, the trial court instructed the prosecutor to formally introduce the detective "so the jury can decide whether this testimony is helpful or not." Id. This statement showed that the court's comments regarding Detective Boyle were not an endorsement of his testimony, and that it was ultimately up to the jury to assess the weight and veracity of the detective's testimony.

Furthermore, the trial court charged the jury at the conclusion of trial regarding witness

26

credibility. (N.T., 1/22/09, pp. 105-116). This instruction again demonstrated the ultimate harmlessness of Judge Hughes' statements to and about Detective Boyle. Whether trial counsel should have objected is of no import because Judge Hughes' commentary, although unwise, did not prejudice petitioner. Thus, petitioner cannot establish that trial counsel was ineffective in this regard.

## V. Trial counsel's alleged failure to impeach Odessey Spearmnan and Burnie Tindale with their prior criminal records

Petitioner raises these claims separately in his 1925(b) Statement. For purposes of this opinion, they will be addressed together. Petitioner claims that trial counsel was ineffective for failing to impeach both Spearman and Tindale regarding their criminal records. This claim has no merit.

With regard to Tindale, trial counsel attempted throughout the proceedings to paint him as a convicted criminal willing to do whatever it took get a lighter sentence. During opening statements, trial counsel told the jury that Tindale was in prison for a string of armed robberies and faced at least fifty years in prison. (N.T., 1/15/09, pp. 35-42). During the trial, counsel cross-examined Tindale extensively on the fact that he was a convicted felon with numerous crimes of dishonesty that also involved guns and violence, that he was charged with three armed bank robbery cases and had other uncharged armed robbery cases, that he received a significant sentencing benefit in his three armed robbery cases as a result of his cooperation with the federal government and believed that he could receive a subsequent reduction in his bank robbery sentence as a result of testifying against petitioner. (N.T., 1/20/09, pp. 16-26).

27

Trial counsel's efforts clearly brought to light Tindale's likely bias in favor of the Commonwealth. Thus, trial counsel was not ineffective for failing to impeach Tindale about his prior record and cooperation with the government.

With regard to Spearman, there was no evidence to suggest that she had an open case and was attempting to curry favor with the Commonwealth in exchange for her testimony. During her direct examination, the prosecutor elicited that Spearmen was on probation for a prostitution case. (N.T., 1/15/09, p. 141). Trail counsel did not cross-examine Spearman about her prostitution case. Nor did he cross-examine her about the remainder of her prior record, which included two drug cases from 2006 and 2007 that resulted in convictions and unpaid fines and costs. These matters were disposed of years before Spearman testified. (See Commonwealth's Motion to Dismiss, p. 62).

The fact that trial counsel did not attack Spearman with her record is of no import. Neither the prostitution case nor the drug cases would have been relevant to the issue of Spearman's general credibility. See Pa.R.E. 609. Thus, trial counsel was not ineffective for failing to explore Spearman's criminal record.

## VI. Trial counsel's failure to request an instruction to demonstrate Tindale and Spearman's respective bias in favor of the Commonwealth.

Next, petitioner claims that trial counsel should have requested an instruction that both Tindale and Spearman were biased in favor of the Commonwealth. As sated above, Tindale and Spearman both had prior records. It was clear from Tindale's testimony that he could have benefitted personally by testifying for the Commonwealth. Spearman's motivation to testify in favor of the Commonwealth was less obvious. At the very least, trial counsel should have

28

requested a specific instruction on bias. There was no strategic reason not to request it. Nevertheless, petitioner was not prejudiced by trial counsel's failure.

The trial court's instructions regarding credibility addressed the issue of bias or prejudice. The court stated:

> Now, ladies and gentlemen, when you evaluate a witness, you are literally focusing on the credibility of the witness, In other words, was that witness' testimony believable and accurate in whole or in part. But that is a decision that is solely for your determination. A couple of factors that might bear on your determination. Does the witness have an interest in the outcome of the case? Does the witness have a friendship or animosity toward person involved in the case? Think about the witness' behavior on the witness stand. What was the person's demeanor? In what manner did they testify literally? What was their body language? How did they speak? **Did they show any bias or prejudice which might have colored their testimony?**
>
> Think about the person's accuracy with respect to their memory and recollection of the events. Focus on the person's ability and opportunity to acquire knowledge or to observe the matters concerning which the witness testified. Think about the consistency or the inconsistency of the testimony, as well as its reasonableness or unreasonableness, in light of all of the evidence in the case.
>
> Now, as you go through this process, you may decide that one of the witnesses testified falsely and did so intentionally. If you reach that conclusion about a fact which is necessary to your decision, then you many for that reason, and that reason alone, disregard everything that the witness said.
>
> Ladies and gentlemen, you are not required to disregard everything that a witness said. You see, ladies and gentlemen, it is entirely possible for a witness to testify falsely and intentionally so in one respect but truthfully about everything else. It's important to remember that the law is grounded in common sense.
>
> You may find that a person lied about one aspect of their testimony, but they were absolutely truthful about everything else. If you find that to be the case, then you may accept the part of the testimony which you find to be trustworthy and believable and disregard everything that you find to be untrustworthy and not worthy of belief.
>
> Ladies and gentlemen, you may discover that there are conflicts in the

29

testimony of the witnesses. Your first responsibility is to try to reconcile the conflict, literally try to piece it together. Ladies and gentlemen, discrepancies between witnesses, conflicts among the testimony of different witnesses may not be a reason or it may be a reason to disbelieve some or all of a witness' testimony. It is critical to remember no two persons witnessing the same event will see it, hear it or remember it the same. It is extremely common for two people to see it, hear it and remember it differently,

First, when you reach conflicts, attempt to reconcile the conflicts. If you cannot reconcile the conflicts, you have the obligation to decide which testimony, if any testimony, to believe; you must reject that which is not true or inaccurate. However, in making your decision, consider whether the conflict involves a matter of importance to your decision or it is merely some unimportant, insignificant detail. Focus, also, on whether the conflict is brought about by an innocent mistake or an intentional falsehood.

Ladies and gentlemen, you want to focus on the quality of the testimony, that is what drives your decision. It is not the number of witnesses on one side or the other. You should not be swayed by the number of witnesses on either side or the number of witnesses on a particular issue. **What you want to focus on is whether the witness was biased or unbiased. Did they have anything to gain from testifying? Was it an interested or disinterested person? Consider all the factors that determine when a person is being truthful, reliable and accurate. Focus on the quality of the testimony of each witness.**

(N.T., 1/22/09, pp. 105-108)(emphasis added).

The court emphasized multiple times that the jury should consider whether a witness – not just Tindale and Spearman – had a reason for presenting biased testimony. These instructions, coupled with counsel's extensive cross-examination of Tindale about his record and level of cooperation with the government and Spearman's admission that she was on probation, clearly conveyed to the jury that it could consider their respective records as potential motivation to give biased testimony. As a result, petitioner cannot demonstrate that he was prejudiced by counsel's failure to request a more specific instruction on bias.

## VII. Failure to Request a Jury Instruction on Other Crimes Evidence

The particular Pennsylvania Rule of Evidence governing the admission of "prior bad acts" is Pa.R.E. 404(b) which provides, in relevant part:

> (b) Other crimes, wrongs, or acts.
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

Pa.R.E. Rule 404(b)(1)-(3).

Under this rule, the admission of prior "bad acts" is not admissible to for purpose of proving the defendant has a bad character, or a "criminal propensity." Commonwealth v. Powell, 598 Pa. 224, 246, 956 A.2d 406, 419 (2008). Nevertheless, this rule permits the admissibility of such evidence for other relevant purposes.

Petitioner contends that trial counsel should have requested a cautionary instruction regarding evidence of other crimes. According to petitioner, a cautionary instruction was required due to Juanita Topping's testimony and statement to police and testimony given by Heather DiTaranto and Detective Boyle.

31

## Prior Gun Possession

In her statement to police, Topping said that, sometime in November 2003, she had seen petitioner and Rasheed Jenkins passing guns back and forth. Topping reiterated that claim in her statement at trial. (N.T., 1/20/09, p. 32; N.T., 1/16/09, p. 20). Likewise, DiTaranto testified that she had observed petitioner with guns. (N.T., 1/16/09, p. 74).

It is clear from the specific testimony referenced above that petitioner's prior possession of guns was not offered to prove that he was a person of bad character or criminal propensity. Rather, it constituted a sequence of events relevant to establish that petitioner had easy access to guns, and that he had a prior relationship with Rasheed Jenkins that involved the possession of weapons. *See* Commonwealth v. Williams, 537 Pa. 1, 20, 640 A.2d 1251, 1260 (1994) (holding that evidence of defendant's possession of guns which were not the murder weapons was relevant to show that he "readily obtained and disposed of handguns"). Petitioner conceded as much in is his Amended PCRA Petition (pp. 74-75).


## Witnesses Not Contacting Police or Being Reluctant to Make an Identification

DiTaranto testified that she did not come forward sooner because petitioner had threatened her. (N.T., 1/16/09, pp. 75-79). Detective Boyle testified that eyewitness John Gallagher expressed his concern while viewing a photo array that the police could not protect him and his family (presumably from petitioner). (N.T., 1/20/09, pp. 37-38). Petitioner concedes that this testimony was relevant for the limited purpose of establishing why DiTaranto did not go to police when petitioner told her he was involved on the shooting, and why Gallagher hedged when making his identification. (Amended PCRA Petition, pp. 75-76).

32

The above-referenced testimony was relevant and had significant probative value. Nevertheless, the court must determine whether its probity was outweighed by any potential prejudice to the defense and whether a cautionary instruction was required.

In support of his claim that a cautionary instruction was required, petitioner cites numerous Federal appellate cases and specifically relies upon Commonwealth v. Billa, 521 Pa. 168, 555 A.2d 835 (1989). In Billa, the defendant was convicted of killing his victim, a young Hispanic woman (whom he also raped). At trial, the Commonwealth introduced evidence of a previous crime, during which Billa assaulted, raped and attempted to kill another young Hispanic woman. Over the objection of defense counsel, the trial court allowed the jury to hear this graphic evidence because it tended to demonstrate the defendant's motive, intent and the absence of accident in the murder and other crimes against the victim. Following the admission of this testimony, trial counsel did not request nor did the trial court give a cautionary instruction.

On appeal, the Pennsylvania Supreme Court found that the trial court properly admitted the evidence of other crimes. Id. at 180-81. Nevertheless, it held that the trial court was remiss for not giving an immediate and limiting curative instruction on other crimes. The Court stated:

> It is clear that the challenged evidence in this case, the vivid description by a prior rape victim of appellant's violent sexual assault against her, was highly inflammatory and created the substantial danger that the jury could be swayed in its deliberations on the degree of guilt by this evidence showing appellant's criminal character and his propensity to sexually assault young Hispanic females. Such evidence was relevant and admissible as the trial court ruled, but the court erred in failing to give an immediate and complete cautionary or limiting instruction to the jury explicitly instructing the jury as to the limited purposes for which the evidence was deemed admissible. Such an instruction neither preceded nor followed the introduction of said evidence, nor was a limiting instruction given in its final charge to the jury. Without such instruction, the jury was left without guidance as to the use it could legitimately make of the inflammatory evidence and may have been more inclined, therefore, to convict the appellant of first degree murder because he had assaulted and intended to kill his

prior victim.

Id..

The Court found that, under the circumstances, trial counsel was ineffective for failing to request a cautionary instruction. As a result, the Court reversed Billa's conviction and ordered a new trial. Id. at 183, 188.

The instant case is clearly distinguishable from Billa. Here, the Commonwealth briefly offered evidence of petitioner's prior possession of guns and that certain witnesses were threatened or felt threatened by petitioner. The evidence involving the guns was offered for the limited purpose of showing petitioner's access to guns and his relationship with Jenkins. It was not offered to inflame the jury. Nor was it offered to prove that petitioner was a bad person. The Commonwealth did not introduce the guns referred to, and it did not attempt to argue that the guns in issue were the murder weapon. The testimony regarding actual or perceived threats was offered for the limited purpose of establishing the reason why DiTaranto did not approach authorities sooner and why Gallagher was reluctant to identify petitioner.

The other crimes testimony in this case was brief and passing. Whereas the other crimes testimony presented in Billa was substantial. The other crimes testimony in this case is neither graphic nor inflammatory. The testimony in Billa was extremely graphic and disturbing. Moreover, the other crimes testimony presented in Billa was nearly identical to the crimes for which Billa was being tried. That is not the case here. Finally, it can be argued that trial counsel in the instant case had an objectively reasonable basis for not requesting a cautionary instruction – he did not want to highlight potentially damaging testimony. In Billa, there was no reasonable basis for trial counsel not to request a cautionary instruction.

Although a cautionary instruction might have been prudent, trial counsel's failure to

34

request such an instruction did not constitute *per se* ineffectiveness. See Commonwealth v. Battle, 883 A.2d 641, 646-647 (Pa. Super. 2005)(Defendant not entitled to post-conviction relief; Failure of defense counsel to object to lack of jury instruction was reasonable trial strategy, and inadequacy of limiting instruction did not prejudice defendant and was harmless, where evidence against defendant was substantial). Furthermore, in light of the other evidence presented by the Commonwealth, which included petitioner's multiple incriminating statements, the testimony regarding other crimes/bad acts did not unduly prejudice petitioner.

## VIII. Appellate Counsel's Alleged Ineffectiveness

Next, petitioner claims that direct appeal counsel was ineffective for failing to raise the claim that trial court erred in prohibiting the defense from establishing that Burnie Tindale committed other crimes. This claim has no merit and is belied by the record.

As stated in Section V above, trial counsel cross-examined Tindale extensively regarding his criminal record. The jury heard that Tindale was a convicted felon. It heard that many of Tindale's crimes involved dishonesty, weapons and/or violence. The jury heard that Tindale was charged in numerous armed bank robbery cases and had other uncharged armed robbery cases. Finally, it heard that Tindale received a significant sentencing benefit in his three armed robbery cases as a result of his cooperation with the federal government, and that he believed he could receive a reduction in his bank robbery sentence as a result of testifying against petitioner.

Petitioner cannot reasonably claim that the trial court did not adequately permit counsel to address Tindale's criminal record. Accordingly, direct appeal counsel was not ineffective for failing to raise this meritless claim.

## IX.    Cumulative effect of errors

Although petitioner raised myriad arguments regarding trial counsel's ineffectiveness and expressed his obvious distaste for the trial court, he cannot demonstrate that the cumulative effect of the alleged errors deprived him of a fair trial. It is well settled that "[a]lthough a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. 'A defendant is entitled to a fair trial but not a perfect one.' " Commonwealth v. Martinolich, 456 Pa. 136, 318 A.2d 680, 695 (1974).

The majority of the claims raised by petitioner have absolutely no merit. With regard to the claims that have arguable merit, petitioner fails to show that he was prejudiced by either trial counsel's error or the trial court's actions. In the end, the evidence and testimony presented at trial established petitioner's guilt beyond a reasonable doubt. Spearman and Gallagher's testimony alone may not have been sufficient to establish petitioner's identity as the shooter. Petitioner, however, was the one who sealed his own fate. He confessed his involvement in the fatal shooting and robbery to three people on three separate occasions. Topping, DiTaranto and Tindale each told the jury the nature and circumstances under which petitioner discussed his involvement in the crime. Thus, the jury had ample evidence on which to base their verdict regardless of what they thought of the identification evidence.

## X.    Discovery Motion

Petitioner claims that this court erred in not granting his Motion for Discovery. In his Amended Petitioner requested, pursuant to Pa.R.Crim.P. 902(A)(16), the following items: Odyssey Spearman's complete criminal extract; an Affidavit of Probable Cause; grand jury

36

minutes of witness Williams; and police statements of Spearman (marked at trial as Commonwealth Exhibits C-38 and C-39), Tisdale (marked at trial as Commonwealth Exhibit C-50), John David Smith and Geneva Bronson.

Pa.R.Crim.P. 902(E), which governs requests for discovery in PCRA matters, provides:

(E) Requests for Discovery

(1) Except as provided in paragraph (E)(2), no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances.

(2)On the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause.

Pa.R.Crim.P. 902(E)(1)-(2).

The PCRA and the criminal rules do not define the term "exceptional circumstances." Rather, it is for the trial court, in its discretion, to determine whether a case is exceptional and discovery is therefore warranted. Commonwealth v. Dickerson, 900 A.2d 407, 412 (Pa.Super.2006).

It is clear from the Rule that since the instant case is non-capital, petitioner is not entitled to the requested materials unless he shows "exceptional circumstances." Petitioner has not articulated the reason he needs the requested items, let alone proved the existence of any exceptional circumstances that warrant such discovery. As a result, this court properly denied petitioner's Discovery Motion.


## XI.    Supplemental Claims for Relief

In his initial *pro se* PCRA petition, petitioner raised numerous claims (prosecutorial misconduct, trial counsel's failure to investigate/interview/call witnesses, trial counsel's failure

37

to request that Odessey Spearman be drug tested when she took the stand, trial court error, "irregular extended colloquy," etc).

PCRA counsel incorporated these issues by reference at the conclusion of his Amended PCRA Petition. Counsel did not, however, raise these issues during oral argument. Nor did he seek to develop them in his pleadings. Since these claims were not sufficiently developed, they were not considered by this court.

Additionally, petitioner it not entitled to hybrid representation. He cannot represent himself while also being represented by competent counsel. A defendant has the constitutional right to proceed without counsel if the decision to do so is knowingly and voluntarily made. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), *accord*, Commonwealth v. Davis, 479 Pa. 274, 388 A.2d 324 (1978). But this right does not permit a defendant (or PCRA petitioner) to have it both ways. Represented by counsel, petitioner has no right to serve as co-counsel. See Commonwealth v. Ellis, 626 A.2d 1137 (Pa. 1993) (a court is not required to consider the *pro se* pleadings of a counseled defendant); Commonwealth v. Pursell, 724 A.2d 293, 302 (Pa. 1999) (PCRA petitioner is not entitled to hybrid representation and PCRA court does not abuse its discretion when it ignores the *pro se* filing of a counseled PCRA petitioner). This court did not commit error or abuse its discretion by not considering petitioner's pro se claims.

38

Petitioner is neither entitled to an evidentiary hearing nor post-conviction relief.  His PCRA petition was properly denied.

BY THE COURT:

_Benjamin Lerner_
Sr. J.

DATE:

_July 9, 2015_